of this Agreement will not be valid or enforced. Therefore, a court may enforce the rest of the provisions of this Agreement even if a provision of this Agreement may be found to be invalid or unenforceable. If Lender goes to court for any reason, Lender can use a copy, filmed or electronic, of any periodic statement, this Agreement, the security agreement or any other document to prove what Borrower owes Lender or that a transaction has taken place. The copy, microfilm, microfiche, or optical image will have the same validity as the original. Borrower agrees that, except to the extent Borrower can show there is a billing error, Borrower's most current periodic statement is the best evidence of Borrower's obligation to pay.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Arbitration.** Borrower and Lender agree that all disputes, claims and controversies between them whether individual, joint, or class in nature, arising from this Agreement or otherwise, including without limitation contract and tort disputes, shall be arbitrated pursuant to the Rules of the American Arbitration Association in effect at the time the claim is filed, upon request of either party. No act to take or dispose of any Collateral shall constitute a waiver of this arbitration agreement or be prohibited by this arbitration agreement. This includes, without limitation, obtaining injunctive relief or a temporary restraining order; invoking a power of sale under any deed of trust or mortgage; obtaining a writ of attachment or imposition of a receiver; or exercising any rights relating to personal property, including taking or disposing of such property with or without judicial process pursuant to Article 9 of the Uniform Commercial Code. Any disputes, claims, or controversies concerning the lawfulness or reasonableness of any act, or exercise of any right, concerning any Collateral, including any claim to rescind, reform, or otherwise modify any agreement relating to the Collateral, shall also be arbitrated, provided however that no arbitrator shall have the right or the power to enjoin or restrain any act of any party. Borrower and Lender agree that in the event of an action for judicial foreclosure pursuant to California Code of Civil Procedure Section 726, or any similar provision in any other state, the commencement of such an action will not constitute a waiver of the right to arbitrate and the court shall refer to arbitration as much of such action, including counterclaims, as lawfully may be referred to arbitration. Judgment upon any award rendered by any arbitrator may be entered in any court having jurisdiction. Nothing in this Agreement shall preclude any party from seeking equitable relief from a court of competent jurisdiction. The statute of limitations, estoppel, waiver, laches, and similar doctrines which would otherwise be applicable in an action brought by a party shall be applicable in any arbitration proceeding, and the commencement of an arbitration proceeding shall be deemed the commencement of an action for these purposes. The Federal Arbitration Act shall apply to the construction, interpretation, and enforcement of this arbitration provision.

**Acknowledgment and Amendments.** Borrower understands and agrees to the terms and conditions in this Agreement. Borrower acknowledges that, subject to applicable laws, Lender has the right to change the terms and conditions of the Credit Line program. If Lender changes the Periodic Rate and subsequent new credit advances are made under this Agreement, the entire balance will be subject to the new rates. Borrower also understands and agrees that Borrower may be subject to other agreements with Lender regarding transfer instruments or access devices which may access Borrower's Credit Line. Any person signing below may request a modification to this Agreement, and, if granted, the modification will be binding upon all signers. By signing this Agreement, Borrower acknowledges that Borrower has read this Agreement. Borrower also acknowledges receipt of a completed copy of this Agreement, including the Fair Credit Billing Notice.

BORROWER:

CORPRINT, INCORPORATED

By: _____
   Marc I. Lewis, President of Corprint, Incorporated

Effective Disbursement Date: __12-13-07__

Bates 0072

CREDIT AGREEMENT AND DISCLOSURE
(Continued)

Loan No: 1990000052                                                                                          Page 5

# BILLING ERROR RIGHTS

## YOUR BILLING RIGHTS

### KEEP THIS NOTICE FOR FUTURE USE

This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.

**Notify us in case of errors or questions about your bill.**

If you think your bill is wrong, or if you need more information about a transaction on your bill, write us on a separate sheet at the address listed on your bill. Write to us as soon as possible. We must hear from you no later than sixty (60) days after we sent you the first bill on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.

In your letter, give us the following information:

Your name and account number.

The dollar amount of the suspected error.

Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are not sure about.

If you have authorized us to pay your bill automatically from your savings or checking account, you can stop the payment on any amount you think is wrong. To stop the payment, your letter must reach us three (3) business days before the automatic payment is scheduled to occur.

**Your rights and our responsibilities after we receive your written notice.**

We must acknowledge your letter within thirty (30) days, unless we have corrected the error by then. Within ninety (90) days, we must either correct the error or explain why we believe the bill was correct.

After we receive your letter, we cannot try to collect any amount you question, or report you as delinquent. We can continue to bill you for the amount you question, including finance charges, and we can apply any unpaid amount against your Credit Limit. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your bill that are not in question.

If we find that we made a mistake on your bill, you will not have to pay any finance charges related to any questioned amount. If we didn't make a mistake, you may have to pay finance charges, and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date on which it is due.

If you fail to pay the amount that we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you and you write to us within ten (10) days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your bill. And, we must tell you the name of anyone we reported you to. We must tell anyone we report you to that the matter has been settled between us when it finally is.

If we don't follow these rules, we can't collect the first $50 of the questioned amount, even if your bill was correct.

# COMMERCIAL SECURITY AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $500,000.00 | 12-12-2007 | 01-01-2009 | 1990000052 | | | | |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Grantor:**  Corprint, Incorporated
360 Cortez Circle
Camarillo, CA 93012

**Lender:**  Affinity Bank
Commercial Banking Center - Ventura
101 S. Chestnut
Ventura, CA 93001

---

THIS COMMERCIAL SECURITY AGREEMENT dated December 12, 2007, is made and executed between Corprint, Incorporated ("Grantor") and Affinity Bank ("Lender").

**GRANT OF SECURITY INTEREST.** For valuable consideration, Grantor grants to Lender a security interest in the Collateral to secure the Indebtedness and agrees that Lender shall have the rights stated in this Agreement with respect to the Collateral, in addition to all other rights which Lender may have by law.

**COLLATERAL DESCRIPTION.** The word "Collateral" as used in this Agreement means the following described property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, in which Grantor is giving to Lender a security interest for the payment of the Indebtedness and performance of all other obligations under the Credit Agreement and this Agreement:

All Inventory, Chattel Paper, Accounts, Equipment, General Intangibles and Consumer Goods

The word "Collateral" also includes all proceeds of the above described collateral, including without limitation, any equipment purchased with proceeds, as well as all accessories, attachments, accessions, replacements and additions, whether added now or later, together with all insurance proceeds and refunds of insurance premiums, if any, and all sums that may be due from third parties who may cause damage to any of the foregoing, whether due to judgment, settlement or other process.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Grantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Grantor holds jointly with someone else and all accounts Grantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Grantor authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COLLATERAL.** With respect to the Collateral, Grantor represents and promises to Lender that:

**Perfection of Security Interest.** Grantor agrees to take whatever actions are requested by Lender to perfect and continue Lender's security interest in the Collateral. Upon request of Lender, Grantor will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Grantor will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender. This is a continuing Security Agreement and will continue in effect even though all or any part of the Indebtedness is paid in full and even though for a period of time Grantor may not be indebted to Lender.

**Notices to Lender.** Grantor will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any (1) change in Grantor's name; (2) change in Grantor's assumed business name(s); (3) change in the management of the Corporation Grantor; (4) change in the authorized signer(s); (5) change in Grantor's principal office address; (6) change in Grantor's state of organization; (7) conversion of Grantor to a new or different type of business entity; or (8) change in the nature of Grantor that directly or indirectly relates to any agreements between Grantor and Lender. No change in Grantor's name or state of organization will take effect until after Lender has received notice.

**No Violation.** The execution and delivery of this Agreement will not violate any law or agreement governing Grantor or to which Grantor is a party, and its certificate or articles of incorporation and bylaws do not prohibit any term or condition of this Agreement.

**Enforceability of Collateral.** To the extent the Collateral consists of accounts, chattel paper, or general intangibles, as defined by the Uniform Commercial Code, the Collateral is enforceable in accordance with its terms, is genuine, and fully complies with all applicable laws and regulations concerning form, content and manner of preparation and execution, and all persons appearing to be obligated on the Collateral have authority and capacity to contract and are in fact obligated as they appear to be on the Collateral. At the time any account becomes subject to a security interest in favor of Lender, the account shall be a good and valid account representing an undisputed, bona fide indebtedness incurred by the account debtor, for merchandise held subject to delivery instructions or previously shipped or delivered pursuant to a contract of sale, or for services previously performed by Grantor with or for the account debtor. So long as this Agreement remains in effect, Grantor shall not, without Lender's prior written consent, compromise, settle, adjust, or extend payment under or with regard to any such Accounts. There shall be no setoffs or counterclaims against any of the Collateral, and no agreement shall have been made under which any deductions or discounts may be claimed concerning the Collateral except those disclosed to Lender in writing.

**Location of the Collateral.** Except in the ordinary course of Grantor's business, Grantor agrees to keep the Collateral (or to the extent the Collateral consists of intangible property such as accounts or general intangibles, the records concerning the Collateral) at Grantor's address shown above or at such other locations as are acceptable to Lender. Upon Lender's request, Grantor will deliver to Lender in form satisfactory to Lender a schedule of real properties and Collateral locations relating to Grantor's operations, including without limitation the following: (1) all real property Grantor owns or is purchasing; (2) all real property Grantor is renting or leasing; (3) all storage facilities Grantor owns, rents, leases, or uses; and (4) all other properties where Collateral is or may be located.

**Removal of the Collateral.** Except in the ordinary course of Grantor's business, including the sales of inventory, Grantor shall not remove the Collateral from its existing location without Lender's prior written consent. To the extent that the Collateral consists of vehicles, or other titled property, Grantor shall not take or permit any action which would require application for certificates of title for the vehicles outside the State of California, without Lender's prior written consent. Grantor shall, whenever requested, advise Lender of the exact location of the Collateral.

**Transactions Involving Collateral.** Except for inventory sold or accounts collected in the ordinary course of Grantor's business, or as otherwise provided for in this Agreement, Grantor shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral. While Grantor is not in default under this Agreement, Grantor may sell inventory, but only in the ordinary course of its business and only to buyers who qualify as a buyer in the ordinary course of business. A sale in the ordinary course of Grantor's business

Bates 0074

COMMERCIAL SECURITY AGREEMENT
(Continued)

Loan No: 1990000052                                                                                      Page 2

partial or total satisfaction of a debt or any bulk sale. Grantor shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Lender. This includes security interests even if junior in right to the security interests granted under this Agreement. Unless waived by Lender, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Lender and shall not be commingled with any other funds; provided however, this requirement shall not constitute consent by Lender to any sale or other disposition. Upon receipt, Grantor shall immediately deliver any such proceeds to Lender.

Title. Grantor represents and warrants to Lender that Grantor holds good and marketable title to the Collateral, free and clear of all liens and encumbrances except for the lien of this Agreement. No financing statement covering any of the Collateral is on file in any public office other than those which reflect the security interest created by this Agreement or to which Lender has specifically consented. Grantor shall defend Lender's rights in the Collateral against the claims and demands of all other persons.

Repairs and Maintenance. Grantor agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect. Grantor further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

Inspection of Collateral. Lender and Lender's designated representatives and agents shall have the right at all reasonable times to examine and inspect the Collateral wherever located.

Taxes, Assessments and Liens. Grantor will pay when due all taxes, assessments and liens upon the Collateral, its use or operation, upon this Agreement, upon any promissory note or notes evidencing the Indebtedness, or upon any of the other Related Documents. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized in Lender's sole opinion. If the Collateral is subjected to a lien which is not discharged within fifteen (15) days, Grantor shall deposit with Lender cash, a sufficient corporate surety bond or other security satisfactory to Lender in an amount adequate to provide for the discharge of the lien plus any interest, costs, attorneys' fees or other charges that could accrue as a result of foreclosure or sale of the Collateral. In any contest Grantor shall defend itself and Lender and shall satisfy any final adverse judgment before enforcement against the Collateral. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings. Grantor further agrees to furnish Lender with evidence that such taxes, assessments, and governmental and other charges have been paid in full and in a timely manner. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized.

Compliance with Governmental Requirements. Grantor shall comply promptly with all laws, ordinances, rules and regulations of all governmental authorities, now or hereafter in effect, applicable to the ownership, production, disposition, or use of the Collateral, including all laws or regulations relating to the undue erosion of highly-erodible land or relating to the conversion of wetlands for the production of an agricultural product or commodity. Grantor may contest in good faith any such law, ordinance or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Lender's interest in the Collateral, in Lender's opinion, is not jeopardized.

Hazardous Substances. Grantor represents and warrants that the Collateral never has been, and never will be so long as this Agreement remains a lien on the Collateral, used in violation of any Environmental Laws or for the generation, manufacture, storage, transportation, treatment, disposal, release or threatened release of any Hazardous Substance. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Collateral for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any Environmental Laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims and losses resulting from a breach of this provision of this Agreement. This obligation to indemnify and defend shall survive the payment of the Indebtedness and the satisfaction of this Agreement.

Maintenance of Casualty Insurance. Grantor shall procure and maintain all risks insurance, including without limitation fire, theft and liability coverage together with such other insurance as Lender may require with respect to the Collateral, in form, amounts, coverages and basis reasonably acceptable to Lender and issued by a company or companies reasonably acceptable to Lender. Grantor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days' prior written notice to Lender and not including any disclaimer of the insurer's liability for failure to give such a notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest, Grantor will provide Lender with such loss payable or other endorsements as Lender may require. If Grantor at any time fails to obtain or maintain any insurance as required under this Agreement, Lender may (but shall not be obligated to) obtain such insurance as Lender deems appropriate, including if Lender so chooses "single interest insurance," which will cover only Lender's interest in the Collateral.

Application of Insurance Proceeds. Grantor shall promptly notify Lender of any loss or damage to the Collateral, whether or not such casualty or loss is covered by insurance. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. All proceeds of any insurance on the Collateral, including accrued proceeds thereon, shall be held by Lender as part of the Collateral. If Lender consents to repair or replacement of the damaged or destroyed Collateral, Lender shall, upon satisfactory proof of expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration. If Lender does not consent to repair or replacement of the Collateral, Lender shall retain a sufficient amount of the proceeds to pay all of the Indebtedness, and shall pay the balance to Grantor. Any proceeds which have not been disbursed within six (6) months after their receipt and which Grantor has not committed to the repair or restoration of the Collateral shall be used to prepay the Indebtedness.

Insurance Reserves. Lender may require Grantor to maintain with Lender reserves for payment of insurance premiums, which reserves shall be created by monthly payments from Grantor of a sum estimated by Lender to be sufficient to produce, at least fifteen (15) days before the premium due date, amounts at least equal to the insurance premiums to be paid. If fifteen (15) days before payment is due, the reserve funds are insufficient, Grantor shall upon demand pay any deficiency to Lender. The reserve funds shall be held by Lender as a general deposit and shall constitute a non-interest-bearing account which Lender may satisfy by payment of the insurance premiums required to be paid by Grantor as they become due. Lender does not hold the reserve funds in trust for Grantor, and Lender is not the agent of Grantor for payment of the insurance premiums required to be paid by Grantor. The responsibility for the payment of premiums shall remain Grantor's sole responsibility.

Insurance Reports. Grantor, upon request of Lender, shall furnish to Lender reports on each existing policy of insurance showing such information as Lender may reasonably request including the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured; (5) the then current value on the basis of which insurance has been obtained and the manner of determining that value; and (6) the expiration date of the policy. In addition, Grantor shall upon request by Lender (however not more often than annually) have an independent appraiser satisfactory to Lender determine, as applicable, the cash value or replacement cost of

the Collateral.

**Financing Statements.** Grantor authorizes Lender to file a UCC financing statement, or alternatively, a copy of this Agreement to perfect Lender's security interest. At Lender's request, Grantor additionally agrees to sign all other documents that are necessary to perfect, protect, and continue Lender's security interest in the Property. Grantor will pay all filing fees, title transfer fees, and other fees and costs involved unless prohibited by law or unless Lender is required by law to pay such fees and costs. Grantor irrevocably appoints Lender to execute documents necessary to transfer title if there is a default. Lender may file a copy of this Agreement as a financing statement. If Grantor changes Grantor's name or address, or the name or address of any person granting a security interest under this Agreement changes, Grantor will promptly notify the Lender of such change.

**GRANTOR'S RIGHT TO POSSESSION AND TO COLLECT ACCOUNTS.** Until default and except as otherwise provided below with respect to accounts, Grantor may have possession of the tangible personal property and beneficial use of all the Collateral and may use it in any lawful manner not inconsistent with this Agreement or the Related Documents, provided that Grantor's right to possession and beneficial use shall not apply to any Collateral where possession of the Collateral by Lender is required by law to perfect Lender's security interest in such Collateral. Until otherwise notified by Lender, Grantor may collect any of the Collateral consisting of accounts. At any time and even though no Event of Default exists, Lender may exercise its rights to collect the accounts and to notify account debtors to make payments directly to Lender for application to the Indebtedness. If Lender at any time has possession of any Collateral, whether before or after an Event of Default, Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral if Lender takes such action for that purpose as Grantor shall request or as Lender, in Lender's sole discretion, shall deem appropriate under the circumstances, but failure to honor any request by Grantor shall not of itself be deemed to be a failure to exercise reasonable care. Lender shall not be required to take any steps necessary to preserve any rights in the Collateral against prior parties, nor to protect, preserve or maintain any security interest given to secure the Indebtedness.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Grantor fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Agreement or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Credit Agreement from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Credit Agreement and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Credit Agreement; or (C) be treated as a balloon payment which will be due and payable at the Credit Agreement's maturity. The Agreement also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Grantor fails to make any payment when due under the Indebtedness.

**Other Defaults.** Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Grantor.

**Default in Favor of Third Parties.** Should Borrower or any Grantor default under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Grantor's property or Grantor's or any Grantor's ability to repay the Indebtedness or perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Grantor or on Grantor's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Insolvency.** The dissolution or termination of Grantor's existence as a going business, the insolvency of Grantor, the appointment of a receiver for any part of Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Grantor or by any governmental agency against any collateral securing the Indebtedness. This includes a garnishment of any of Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or Guarantor dies or becomes incompetent or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Agreement, at any time thereafter, Lender shall have all the rights of a secured party under the California Uniform Commercial Code. In addition and without limitation, Lender may exercise any one or more of the following rights and remedies:

**Accelerate Indebtedness.** Lender may declare the entire Indebtedness, including any prepayment penalty which Grantor would be required to pay, immediately due and payable, without notice of any kind to Grantor.

**Assemble Collateral.** Lender may require Grantor to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Grantor to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter upon the property of Grantor to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Grantor agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Grantor after repossession.

Sell the Collateral. Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Grantor. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Grantor, and other persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However, no notice need be provided to any person who, after Event of Default occurs, enters into and authenticates an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least ten (10) days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Indebtedness secured by this Agreement and shall be payable on demand, with interest at the Note rate from date of expenditure until repaid.

Appoint Receiver. Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the Rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

Collect Revenues, Apply Accounts. Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income, and revenues therefrom and hold the same as security for the Indebtedness or apply it to payment of the Indebtedness in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose, or realize on the Collateral as Lender may determine, whether or not Indebtedness or Collateral is then due. For these purposes, Lender may, on behalf of and in the name of Grantor, receive, open and dispose of mail addressed to Grantor; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment, or storage of any Collateral. To facilitate collection, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

Obtain Deficiency. If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Grantor for any deficiency remaining on the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Grantor shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

Other Rights and Remedies. Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity, or otherwise.

Election of Remedies. Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, the Related Documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Agreement, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

MISCELLANEOUS PROVISIONS. The following miscellaneous provisions are a part of this Agreement:

Amendments. This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

Arbitration. Grantor and Lender agree that all disputes, claims and controversies between them whether individual, joint, or class in nature, arising from this Agreement or otherwise, including without limitation contract and tort disputes, shall be arbitrated pursuant to the Rules of the American Arbitration Association in effect at the time the claim is filed, upon request of either party. No act to take or dispose of any Collateral shall constitute a waiver of this arbitration agreement or be prohibited by this arbitration agreement. This includes, without limitation, obtaining injunctive relief or a temporary restraining order; invoking a power of sale under any deed of trust or mortgage; obtaining a writ of attachment or imposition of a receiver; or exercising any rights relating to personal property, including taking or disposing of such property with or without judicial process pursuant to Article 9 of the Uniform Commercial Code. Any disputes, claims, or controversies concerning the lawfulness or reasonableness of any act, or exercise of any right, concerning any Collateral, including any claim to rescind, reform, or otherwise modify any agreement relating to the Collateral, shall also be arbitrated, provided however that no arbitrator shall have the right or the power to enjoin or restrain any act of any party. Grantor and Lender agree that in the event of an action for judicial foreclosure pursuant to California Code of Civil Procedure Section 726, or any similar provision in any other state, the commencement of such an action will not constitute a waiver of the right to arbitrate and the court shall refer to arbitration as much of such action, including counterclaims, as lawfully may be referred to arbitration. Judgment upon any award rendered by any arbitrator may be entered in any court having jurisdiction. Nothing in this Agreement shall preclude any party from seeking equitable relief from a court of competent jurisdiction. The statute of limitations, estoppel, waiver, laches, and similar doctrines which would otherwise be applicable in an action brought by a party shall be applicable in any arbitration proceeding, and the commencement of an arbitration proceeding shall be deemed the commencement of an action for these purposes. The Federal Arbitration Act shall apply to the construction, interpretation, and enforcement of this arbitration provision.

Attorneys' Fees; Expenses. Grantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Grantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Grantor also shall pay all court costs and such additional fees as may be directed by the court.

Caption Headings. Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

Governing Law. This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of California.

Preference Payments. Any monies Lender pays because of an asserted preference claim in Grantor's bankruptcy will become a part of the Indebtedness and, at Lender's option, shall be payable by Grantor as provided in this Agreement.

No Waiver by Lender. Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing

COMMERCIAL SECURITY AGREEMENT

Loan No: 1990000052                                                                                          Page 5

and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

Notices. Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

Power of Attorney. Grantor hereby appoints Lender as Grantor's irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect, amend, or to continue the security interest granted in this Agreement or to demand termination of filings of other secured parties. Lender may at any time, and without further authorization from Grantor, file a carbon, photographic or other reproduction of any financing statement or of this Agreement for use as a financing statement. Grantor will reimburse Lender for all expenses for the perfection and the continuation of the perfection of Lender's security interest in the Collateral.

Waiver of Co-Obligor's Rights. If more than one person is obligated for the indebtedness, Grantor irrevocably waives, disclaims and relinquishes all claims against such other person which Grantor has or would otherwise have by virtue of payment of the Indebtedness or any part thereof, specifically including but not limited to all rights of indemnity, contribution or exoneration.

Severability. If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

Successors and Assigns. Subject to any limitations stated in this Agreement on transfer of Grantor's interest, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Collateral becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Agreement and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Agreement or liability under the indebtedness.

Survival of Representations and Warranties. All representations, warranties, and agreements made by Grantor in this Agreement shall survive the execution and delivery of this Agreement, shall be continuing in nature, and shall remain in full force and effect until such time as Grantor's Indebtedness shall be paid in full.

Time is of the Essence. Time is of the essence in the performance of this Agreement.

Waive Jury. To the extent permitted by applicable law, all parties to this Agreement hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party. (Initial Here _____ )

DEFINITIONS. The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code:

Agreement. The word "Agreement" means this Commercial Security Agreement, as this Commercial Security Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Commercial Security Agreement from time to time.

Borrower. The word "Borrower" means Corprint, Incorporated and includes all co-signers and co-makers signing the Credit Agreement and all their successors and assigns.

Collateral. The word "Collateral" means all of Grantor's right, title and interest in and to all the Collateral as described in the Collateral Description section of this Agreement.

Credit Agreement. The words "Credit Agreement" mean the Credit Agreement executed by Corprint, Incorporated in the principal amount of $500,000.00 dated December 12, 2007, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

Default. The word "Default" means the Default set forth in this Agreement in the section titled "Default".

Environmental Laws. The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., Chapters 6.5 through 7.7 of Division 20 of the California Health and Safety Code, Section 25100, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

Event of Default. The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

Grantor. The word "Grantor" means Corprint, Incorporated.

Guarantor. The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

Guaranty. The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Credit Agreement.

Hazardous Substances. The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or

Loan No: 1990000052

waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Credit Agreement or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Grantor is responsible under this Agreement or under any of the Related Documents.

**Lender.** The word "Lender" means Affinity Bank, its successors and assigns.

**Property.** The word "Property" means all of Grantor's right, title and interest in and to all the Property as described in the "Collateral Description" section of this Agreement.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

GRANTOR HAS READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS COMMERCIAL SECURITY AGREEMENT AND AGREES TO ITS TERMS. THIS AGREEMENT IS DATED DECEMBER 12, 2007.

GRANTOR:

CORPRINT, INCORPORATED

By: _____
      Marc I. Lewis, President of Corprint, Incorporated

# COMMERCIAL GUARANTY

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "* * *" has been omitted due to text length limitations.

**Borrower:** Corprint, Incorporated
360 Cortez Circle
Camarillo, CA 93012

**Lender:** Affinity Bank
Commercial Banking Center - Ventura
101 S. Chestnut
Ventura, CA 93001

**Guarantor:** Marc I. Lewis
2454 Blanchard Road
Camarillo, CA 93012

**CONTINUING GUARANTEE OF PAYMENT AND PERFORMANCE.** For good and valuable consideration, Guarantor absolutely and unconditionally guarantees full and punctual payment and satisfaction of the Indebtedness of Borrower to Lender, and the performance and discharge of all Borrower's obligations under the Credit Agreement and the Related Documents. This is a guaranty of payment and performance and not of collection, so Lender can enforce this Guaranty against Guarantor even when Lender has not exhausted Lender's remedies against anyone else obligated to pay the Indebtedness or against any collateral securing the Indebtedness, this Guaranty or any other guaranty of the Indebtedness. Guarantor will make any payments to Lender or its order, on demand, in legal tender of the United States of America, in same-day funds, without set-off or deduction or counterclaim, and will otherwise perform Borrower's obligations under the Credit Agreement and Related Documents. Under this Guaranty, Guarantor's liability is unlimited and Guarantor's obligations are continuing.

**INDEBTEDNESS.** The word "Indebtedness" as used in this Guaranty means all of the principal amount outstanding from time to time and at any one or more times, accrued unpaid interest thereon and all collection costs and legal expenses related thereto permitted by law, attorneys' fees, arising from any and all debts, liabilities and obligations of every nature or form, now existing or hereafter arising or acquired, that Borrower individually or collectively or interchangeably with others, owes or will owe Lender. "Indebtedness" includes, without limitation, loans, advances, debts, overdraft indebtedness, credit card indebtedness, lease obligations, liabilities and obligations under any interest rate protection agreements or foreign currency exchange agreements or commodity price protection agreements, other obligations, and liabilities of Borrower, and any present or future judgments against Borrower, future advances, loans or transactions that renew, extend, modify, refinance, consolidate or substitute these debts, liabilities and obligations whether: voluntarily or involuntarily incurred; due or to become due by their terms or acceleration; absolute or contingent; liquidated or unliquidated; determined or undetermined; direct or indirect; primary or secondary in nature or arising from a guaranty or surety; secured or unsecured; joint or several or joint and several; evidenced by a negotiable or non-negotiable instrument or writing; originated by Lender or another or others; barred or unenforceable against Borrower for any reason whatsoever; for any transactions that may be voidable for any reason (such as infancy, insanity, ultra vires or otherwise); and originated then reduced or extinguished and then afterwards increased or reinstated.

If Lender presently holds one or more guaranties, or hereafter receives additional guaranties from Guarantor, Lender's rights under all guaranties shall be cumulative. This Guaranty shall not (unless specifically provided below to the contrary) affect or invalidate any such other guaranties. Guarantor's liability will be Guarantor's aggregate liability under the terms of this Guaranty and any such other unterminated guaranties.

**CONTINUING GUARANTY.** THIS IS A "CONTINUING GUARANTY" UNDER WHICH GUARANTOR AGREES TO GUARANTEE THE FULL AND PUNCTUAL PAYMENT, PERFORMANCE AND SATISFACTION OF THE INDEBTEDNESS OF BORROWER TO LENDER, NOW EXISTING OR HEREAFTER ARISING OR ACQUIRED, ON AN OPEN AND CONTINUING BASIS. ACCORDINGLY, ANY PAYMENTS MADE ON THE INDEBTEDNESS WILL NOT DISCHARGE OR DIMINISH GUARANTOR'S OBLIGATIONS AND LIABILITY UNDER THIS GUARANTY FOR ANY REMAINING AND SUCCEEDING INDEBTEDNESS EVEN WHEN ALL OR PART OF THE OUTSTANDING INDEBTEDNESS MAY BE A ZERO BALANCE FROM TIME TO TIME.

**DURATION OF GUARANTY.** This Guaranty will take effect when received by Lender without the necessity of any acceptance by Lender, or any notice to Guarantor or to Borrower, and will continue in full force until all the Indebtedness incurred or contracted before receipt by Lender of any notice of revocation shall have been fully and finally paid and satisfied and all of Guarantor's other obligations under this Guaranty shall have been performed in full. If Guarantor elects to revoke this Guaranty, Guarantor may only do so in writing. Guarantor's written notice of revocation must be mailed to Lender, by certified mail, at Lender's address listed above or such other place as Lender may designate in writing. Written revocation of this Guaranty will apply only to advances or new Indebtedness created after actual receipt by Lender of Guarantor's written revocation. For this purpose and without limitation, the term "new Indebtedness" does not include the Indebtedness which at the time of notice of revocation is contingent, unliquidated, undetermined or not due and which later becomes absolute, liquidated, determined or due. This Guaranty will continue to bind Guarantor for all the Indebtedness incurred by Borrower or committed by Lender prior to receipt of Guarantor's written notice of revocation, including any extensions, renewals, substitutions or modifications of the Indebtedness. All renewals, extensions, substitutions, and modifications of the Indebtedness granted after Guarantor's revocation, are contemplated under this Guaranty and, specifically will not be considered to be new Indebtedness. This Guaranty shall bind Guarantor's estate as to the Indebtedness created both before and after Guarantor's death or incapacity, regardless of Lender's actual notice of Guarantor's death. Subject to the foregoing, Guarantor's executor or administrator or other legal representative may terminate this Guaranty in the same manner in which Guarantor might have terminated it and with the same effect. Release of any other guarantor or termination of any other guaranty of the Indebtedness shall not affect the liability of Guarantor under this Guaranty. A revocation Lender receives from any one or more Guarantors shall not affect the liability of any remaining Guarantors under this Guaranty. Guarantor's obligations under this Guaranty shall be in addition to any of Guarantor's obligations, or any of them, under any other guaranties of the Indebtedness or any other person heretofore or hereafter given to Lender unless such other guaranties are modified or revoked in writing; and this Guarantor shall not, unless provided in this Guaranty, affect, invalidate, or supersede any such other guaranty. It is anticipated that fluctuations may occur in the aggregate amount of the Indebtedness covered by this Guaranty, and Guarantor specifically acknowledges and agrees that reductions in the amount of the Indebtedness, even to zero dollars ($0.00), prior to Guarantor's written revocation of this Guaranty shall not constitute a termination of this Guaranty. This Guaranty is binding upon Guarantor and Guarantor's heirs, successors and assigns so long as any of the Indebtedness remains unpaid and even though the Indebtedness may from time to time be zero dollars ($0.00).

**OBLIGATIONS OF MARRIED PERSONS.** Any married person who signs this Guaranty hereby expressly agrees that recourse under this Guaranty may be had against both his or her separate property and community property.

**GUARANTOR'S AUTHORIZATION TO LENDER.** Guarantor authorizes Lender, either before or after any revocation hereof, without notice or demand and without lessening Guarantor's liability under this Guaranty, from time to time: (A) prior to revocation as set forth above, to make one or more additional secured or unsecured loans to Borrower, to lease equipment or other goods to Borrower, or otherwise to extend additional credit to Borrower; (B) to alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of the Indebtedness or any part of the Indebtedness, including increases and decreases of the rate of interest on the

Indebtedness; extensions may be repeated and may be for longer than the original loan term; (C) to take and hold security for the payment of this Guaranty or the Indebtedness, and exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any such security, with or without the substitution of new collateral; (D) to release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose; (E) to determine how, when and what application of payments and credits shall be made on the Indebtedness; (F) to apply such security and direct the order or manner of sale thereof, including without limitation, any nonjudicial sale permitted by the terms of the controlling security agreement or deed of trust, as Lender in its discretion may determine; (G) to sell, transfer, assign or grant participations in all or any part of the Indebtedness; and (H) to assign or transfer this Guaranty in whole or in part.

**GUARANTOR'S REPRESENTATIONS AND WARRANTIES.** Guarantor represents and warrants to Lender that (A) no representations or agreements of any kind have been made to Guarantor which would limit or qualify in any way the terms of this Guaranty; (B) this Guaranty is executed at Borrower's request and not at the request of Lender; (C) Guarantor has full power, right and authority to enter into this Guaranty; (D) the provisions of this Guaranty do not conflict with or result in a default under any agreement or other instrument binding upon Guarantor and do not result in a violation of any law, regulation, court decree or order applicable to Guarantor; (E) Guarantor has not and will not, without the prior written consent of Lender, sell, lease, assign, encumber, hypothecate, transfer, or otherwise dispose of all or substantially all of Guarantor's assets, or any interest therein; (F) upon Lender's request, Guarantor will provide to Lender financial and credit information in form acceptable to Lender, and all such financial information which currently has been, and all future financial information which will be provided to Lender is and will be true and correct in all material respects and fairly present Guarantor's financial condition as of the dates the financial information is provided; (G) no material adverse change has occurred in Guarantor's financial condition since the date of the most recent financial statements provided to Lender and no event has occurred which may materially adversely affect Guarantor's financial condition; (H) no litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Guarantor is pending or threatened; (I) Lender has made no representation to Guarantor as to the creditworthiness of Borrower; and (J) Guarantor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition. Guarantor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under this Guaranty, and Guarantor further agrees that, absent a request for information, Lender shall have no obligation to disclose to Guarantor any information or documents acquired by Lender in the course of its relationship with Borrower.

**GUARANTOR'S WAIVERS.** Except as prohibited by applicable law, Guarantor waives any right to require Lender to (A) make any presentment, protest, demand, or notice of any kind, including notice of change of any terms of repayment of the Indebtedness, default by Borrower or any other guarantor or surety, any action or nonaction taken by Borrower, Lender, or any other guarantor or surety of Borrower, or the creation of new or additional Indebtedness; (B) proceed against any person, including Borrower, before proceeding against Guarantor; (C) proceed against any collateral for the Indebtedness, including Borrower's collateral, before proceeding against Guarantor; (D) apply any payments or proceeds received against the Indebtedness in any order; (E) give notice of the terms, time, and place of any sale of the collateral pursuant to the Uniform Commercial Code or any other law governing such sale; (F) disclose any information about the Indebtedness, the Borrower, the collateral, or any other guarantor or surety, or about any action or nonaction of Lender; or (G) pursue any remedy or course of action in Lender's power whatsoever.

Guarantor also waives any and all rights or defenses arising by reason of (H) any disability or other defense of Borrower, any other guarantor or surety or any other person; (I) the cessation from any cause whatsoever, other than payment in full, of the Indebtedness; (J) the application of proceeds of the Indebtedness by Borrower for purposes other than the purposes understood and intended by Guarantor and Lender; (K) any act or omission or commission by Lender which directly or indirectly results in or contributes to the discharge of Borrower or any other guarantor or surety, or the Indebtedness, or the loss or release of any collateral by operation of law or otherwise; (L) any statute of limitations in any action under this Guaranty or on the Indebtedness; or (M) any modification or change in terms of the Indebtedness, whatsoever, including without limitation, the renewal, extension, acceleration, or other change in the time payment of the Indebtedness is due and any change in the interest rate, and including any such modification or change in terms after revocation of this Guaranty on the Indebtedness incurred prior to such revocation.

Guarantor waives all rights and any defenses arising out of an election of remedies by Lender even though that the election of remedies, such as a non-judicial foreclosure with respect to security for a guaranteed obligation, has destroyed Guarantor's rights of subrogation and reimbursement against Borrower by operation of Section 580d of the California Code of Civil Procedure or otherwise.

Guarantor waives all rights and defenses that Guarantor may have because Borrower's obligation is secured by real property. This means among other things: (1) Lender may collect from Guarantor without first foreclosing on any real or personal property collateral pledged by Borrower; (2) If Lender forecloses on any real property collateral pledged by Borrower: (a) the amount of Borrower's obligation may be reduced only by the price for which the collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price; (b) Lender may collect from Guarantor even if Lender, by foreclosing on the real property collateral, has destroyed any right Guarantor may have to collect from Borrower. This is an unconditional and irrevocable waiver of any rights and defenses Guarantor may have because Borrower's obligation is secured by real property. These rights and defenses include, but are not limited to, any rights and defenses based upon Section 580a, 580b, 580d, or 726 of the Code of Civil Procedure.

Guarantor understands and agrees that the foregoing waivers are unconditional and irrevocable waivers of substantive rights and defenses to which Guarantor might otherwise be entitled under state and federal law. The rights and defenses waived include, without limitation, those provided by California laws of suretyship and guaranty, anti-deficiency laws, and the Uniform Commercial Code. Guarantor acknowledges that Guarantor has provided these waivers of rights and defenses with the intention that they be fully relied upon by Lender. Guarantor further understands and agrees that this Guaranty is a separate and independent contract between Guarantor and Lender, given for full and ample consideration, and is enforceable on its own terms. Until all of the Indebtedness is paid in full, Guarantor waives any right to enforce any remedy Guarantor may have against the Borrower or any other guarantor, surety, or other person, and further, Guarantor waives any right to participate in any collateral for the Indebtedness now or hereafter held by Lender.

**GUARANTOR'S UNDERSTANDING WITH RESPECT TO WAIVERS.** Guarantor warrants and agrees that each of the waivers set forth above is made with Guarantor's full knowledge of its significance and consequences and that, under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any such waiver is determined to be contrary to any applicable law or public policy, such waiver shall be effective only to the extent permitted by law or public policy.

**SUBORDINATION OF BORROWER'S DEBTS TO GUARANTOR.** Guarantor agrees that the Indebtedness, whether now existing or hereafter created, shall be superior to any claim that Guarantor may now have or hereafter acquire against Borrower, whether or not Borrower becomes insolvent. Guarantor hereby expressly subordinates any claim Guarantor may have against Borrower, upon any account whatsoever, to any claim that Lender may now or hereafter have against Borrower. In the event of insolvency and consequent liquidation of the assets of Borrower, through bankruptcy, by an assignment for the benefit of creditors, by voluntary liquidation, or otherwise, the assets of Borrower applicable to the payment of the claims of both Lender and Guarantor shall be paid to Lender and shall be first applied by Lender to the Indebtedness. Guarantor does hereby assign to Lender all claims which it may have or acquire against Borrower or against any assignee or trustee in bankruptcy of Borrower; provided however, that such assignment shall be effective only for the purpose of assuring to Lender full payment in

Loan No: 1990000052                                                                                          Page 3

legal tender of the Indebtedness. If Lender so requests, any notes or credit agreements now or hereafter evidencing any debts or obligations of Borrower to Guarantor shall be marked with a legend that the same are subject to this Guaranty and shall be delivered to Lender. Guarantor agrees, and Lender is hereby authorized, in the name of Guarantor, from time to time to file financing statements and continuation statements and to execute documents and to take such other actions as Lender deems necessary or appropriate to perfect, preserve and enforce its rights under this Guaranty.

MISCELLANEOUS PROVISIONS.  The following miscellaneous provisions are a part of this Guaranty:

Amendments.  This Guaranty, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Guaranty.  No alteration of or amendment to this Guaranty shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

Arbitration.  Borrower and Guarantor and Lender agree that all disputes, claims and controversies between them whether individual, joint, or class in nature, arising from this Guaranty or otherwise, including without limitation contract and tort disputes, shall be arbitrated pursuant to the Rules of the American Arbitration Association in effect at the time the claim is filed, upon request of either party.  No act to take or dispose of any Collateral shall constitute a waiver of this arbitration agreement or be prohibited by this arbitration agreement.  This includes, without limitation, obtaining injunctive relief or a temporary restraining order; invoking a power of sale under any deed of trust or mortgage; obtaining a writ of attachment or imposition of a receiver, or exercising any rights relating to personal property, including taking or disposing of such property with or without judicial process pursuant to Article 9 of the Uniform Commercial Code.  Any disputes, claims, or controversies concerning the lawfulness or reasonableness of any act, or exercise of any right, concerning any Collateral, including any claim to rescind, reform, or otherwise modify any agreement relating to the Collateral, shall also be arbitrated, provided however that no arbitrator shall have the right or the power to enjoin or restrain any act of any party.  Borrower and Guarantor and Lender agree that in the event of an action for judicial foreclosure pursuant to California Code of Civil Procedure Section 726, or any similar provision in any other state, the commencement of such an action will not constitute a waiver of the right to arbitrate and the court shall refer to arbitration as much of such action, including counterclaims, as lawfully may be referred to arbitration.  Judgment upon any award rendered by any arbitrator may be entered in any court having jurisdiction.  Nothing in this Guaranty shall preclude any party from seeking equitable relief from a court of competent jurisdiction.  The statute of limitations, estoppel, waiver, laches, and similar doctrines which would otherwise be applicable in an action brought by a party shall be applicable in any arbitration proceeding, and the commencement of an arbitration proceeding shall be deemed the commencement of an action for these purposes.  The Federal Arbitration Act shall apply to the construction, interpretation, and enforcement of this arbitration provision.

Attorneys' Fees; Expenses.  Guarantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Guaranty.  Lender may hire or pay someone else to help enforce this Guaranty, and Guarantor shall pay the costs and expenses of such enforcement.  Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services.  Guarantor also shall pay all court costs and such additional fees as may be directed by the court.

Caption Headings.  Caption headings in this Guaranty are for convenience purposes only and are not to be used to interpret or define the provisions of this Guaranty.

Governing Law.  This Guaranty will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions.  This Guaranty has been accepted by Lender in the State of California.

Integration.  Guarantor further agrees that Guarantor has read and fully understands the terms of this Guaranty; Guarantor has had the opportunity to be advised by Guarantor's attorney with respect to this Guaranty; the Guaranty fully reflects Guarantor's intentions and parol evidence is not required to interpret the terms of this Guaranty.  Guarantor hereby indemnifies and holds Lender harmless from all losses, claims, damages, and costs (including Lender's attorneys' fees) suffered or incurred by Lender as a result of any breach by Guarantor of the warranties, representations and agreements of this paragraph.

Interpretation.  In all cases where there is more than one Borrower or Guarantor, then all words used in this Guaranty in the singular shall be deemed to have been used in the plural where the context and construction so require; and where there is more than one Borrower named in this Guaranty or when this Guaranty is executed by more than one Guarantor, the words "Borrower" and "Guarantor" respectively shall mean all and any one or more of them.  The words "Guarantor," "Borrower," and "Lender" include the heirs, successors, assigns, and transferees of each of them.  If a court finds that any provision of this Guaranty is not valid or should not be enforced, that fact by itself will not mean that the rest of this Guaranty will not be valid or enforced.  Therefore, a court will enforce the rest of the provisions of this Guaranty even if a provision of this Guaranty may be found to be invalid or unenforceable.  If any one or more of Borrower or Guarantor are corporations, partnerships, limited liability companies, or similar entities, it is not necessary for Lender to inquire into the powers of Borrower or Guarantor or of the officers, directors, partners, managers, or other agents acting or purporting to act on their behalf, and any indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Guaranty.

Notices.  Any notice required to be given under this Guaranty shall be given in writing, and, except for revocation notices by Guarantor, shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Guaranty.  All revocation notices by Guarantor shall be in writing and shall be effective upon delivery to Lender as provided in the section of this Guaranty entitled "DURATION OF GUARANTY."  Any party may change its address for notices under this Guaranty by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address.  For notice purposes, Guarantor agrees to keep Lender informed at all times of Guarantor's current address.  Unless otherwise provided or required by law, if there is more than one Guarantor, any notice given by Lender to any Guarantor is deemed to be notice given to all Guarantors.

No Waiver by Lender.  Lender shall not be deemed to have waived any rights under this Guaranty unless such waiver is given in writing and signed by Lender.  No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right.  A waiver by Lender of a provision of this Guaranty shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Guaranty.  No prior waiver by Lender, nor any course of dealing between Lender and Guarantor, shall constitute a waiver of any of Lender's rights or of any of Guarantor's obligations as to any future transactions.  Whenever the consent of Lender is required under this Guaranty, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

Successors and Assigns.  Subject to any limitations stated in this Guaranty on transfer of Guarantor's interest, this Guaranty shall be

Loan No: 1990000052                                                                                                                    Page 4

---

Waive Jury.  To the extent permitted by applicable law, Lender and Guarantor hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Borrower against the other.  (Initial Here _____ )

**DEFINITIONS.**  The following capitalized words and terms shall have the following meanings when used in this Guaranty.  Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America.  Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require.  Words and terms not otherwise defined in this Guaranty shall have the meanings attributed to such terms in the Uniform Commercial Code:

Borrower.  The word "Borrower" means Corprint, Incorporated and includes all co-signers and co-makers signing the Credit Agreement and all their successors and assigns.

Credit Agreement.  The words "Credit Agreement" mean and includes without limitation all of Borrower's promissory notes and/or credit agreements evidencing Borrower's loan obligations in favor of Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of and substitutions for promissory notes or credit agreements.

Guarantor.  The word "Guarantor" means everyone signing this Guaranty, including without limitation Marc I. Lewis, and in each case, any signer's successors and assigns.

Guaranty.  The word "Guaranty" means this guaranty from Guarantor to Lender.

Indebtedness.  The word "Indebtedness" means Borrower's indebtedness to Lender as more particularly described in this Guaranty.

Lender.  The word "Lender" means Affinity Bank, its successors and assigns.

Related Documents.  The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**EACH UNDERSIGNED GUARANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS GUARANTY AND AGREES TO ITS TERMS.  IN ADDITION, EACH GUARANTOR UNDERSTANDS THAT THIS GUARANTY IS EFFECTIVE UPON GUARANTOR'S EXECUTION AND DELIVERY OF THIS GUARANTY TO LENDER AND THAT THE GUARANTY WILL CONTINUE UNTIL TERMINATED IN THE MANNER SET FORTH IN THE SECTION TITLED "DURATION OF GUARANTY".  NO FORMAL ACCEPTANCE BY LENDER IS NECESSARY TO MAKE THIS GUARANTY EFFECTIVE.  THIS GUARANTY IS DATED DECEMBER 12, 2007.**

GUARANTOR:

X _____
Marc I. Lewis

---

LASER PRO Lending, Ver. 5.42.10.003  Copr. Harland Financial Solutions, Inc. 1997, 2007.  All Rights Reserved.   CA - G.\HARLAND\CFI\LPL\E20.FC  TR-1674  PR-114

# EXHIBIT J

Bates 0084

# Affinity Bank

CORPRINT INC
360 CORTEZ CIR
CAMARILLO CA  93012

### Loan Billing Statement

==================================================================

ENCINO OFFICE                                    Telephone:818-386-9763
15840 VENTURA BLVD
ENCINO, CA 91436

==================================================================
### Business LOC Loan 1990000052
==================================================================

|  Date | Description | -----Payment Split-----<br>Principal | Interest | Transaction<br>Amount | Principal<br>Balance |
|---|---|---|---|---|---|
| 09/21/2009 | Balance Last Statement |  |  |  | 500,000.00 |
| 10/01/2009 | Interest Only Payment |  |  |  |  |
|  |  | .00 | 1,458.33 | 1,458.33 |  |
| 10/22/2009 | Balance This Statement |  |  |  | 500,000.00 |

- - - - - - F i n a n c e   C h a r g e   C a l c u l a t i o n - - - - - -

| From<br>Date | ** Annual **<br>Percentage Rate | Daily Periodic<br>Rate |  | Principal | Days | Accrued<br>Finance Charge |
|---|---|---|---|---|---|---|
| 09/22/2009 | 3.8020 % | .00010416 |  | 500,000.00 | 9 | 468.75 |
| 10/01/2009 | 3.8020 % | .00010416 |  | 500,000.00 | 22 | 1,145.83 |

Periodic Rates May Vary
- - - - - - - - - - - - -L o a n   S u m m a r y- - - - - - - - - -
Credit Limit:                    500,000.00    Interest Accrued From:          09/22/2009
Available Credit:                              Interest Accrued Thru:          10/22/2009
Maturity Date:                   01/01/2010    Principal Due:                        .00
- - - - Activity This Period - - - -           Interest Due:                    1,614.58
Finance Charge Paid:             1,458.33      Total Payment Due:               1,614.58
                                               Payment Due Date:               11/01/2009
** Finance Charge **             1,614.58

Add additional late charge of 80.72 if no payment is received by 11/11/2009

The payment due will be charged to Checking Account 1910066421

Finance Charge Paid 2009:      11,112.33

FDIC



# EXHIBIT K

Bates  0086

**Total Brand Delivery, Inc.**
**2 Month Cash-Flow Projection**
**For the Period Beginning 01/08/2010 to 03/05/201**

| | Week-ending 01/15/10 | Week-ending 01/22/10 | Week-ending 01/29/10 | Week-ending 02/05/10 | Week-ending 02/12/10 | Week-ending 02/19/10 | Week-ending 02/26/10 | Week-ending 03/05/10 |
|---|---|---|---|---|---|---|---|---|
| **Opening Cash Position** | 4,464.95 | 63,749.36 | 64,061.75 | 29,027.09 | (2,942.90) | 15,663.57 | 3,489.85 | 7,805.05 |
| Cash Position | 0.00 | | | | | | | |
| Collections | 92,953.90 | 12,913.34 | 1,336.78 | 17,145.12 | 26,163.64 | 11,562.72 | 49,797.71 | 34,300.00 |
| **Net Cash** | 97,418.85 | 76,662.71 | 65,398.53 | 46,172.21 | 23,220.74 | 27,226.29 | 53,287.57 | 42,105.06 |
| COGS / COD | | 8,433.19 | 11,104.36 | 9,141.52 | 2,706.40 | 8,052.23 | 9,702.33 | 5,300.00 |
| **Cash net of COGS payments** | 97,418.85 | 68,229.52 | 54,294.17 | 37,030.69 | 20,514.34 | 19,174.06 | 43,585.24 | 36,805.06 |
| Rebate Funds | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 |
| Payroll | 17,586.10 | | | 17,586.10 | | 1,758.10 | 17,586.10 | 17,586.10 |
| Benefits - Due 11th of each month | 2,234.12 | | | | | 2,234.12 | | |
| Commissions Accrued to be paid | 3,498.50 | | | 3,498.50 | | 2,286.21 | | 4,508.17 |
| Temp Labor | 4,000.00 | | 3,900.00 | | | 4,000.00 | | 3,900.00 |
| Pat Retrig | 1,500.00 | | 1,500.00 | | | 1,500.00 | | |
| 4Q2009 Sales Tax Due 01/31/10 | | | | 15,283.22 | | | | |
| Bank Line Interest | | | 2,000.00 | | | | | 2,000.00 |
| Auto | | | 1,889.00 | | | | 1,889.00 | |
| Utilities | | | 6,192.31 | | | | 6,192.31 | |
| Postage / Shipping | 605.77 | 605.77 | 605.77 | 605.77 | 605.77 | 605.77 | 605.77 | 605.77 |
| IT | 945.00 | | 945.00 | | 945.00 | | 945.00 | |
| Dues & Subs | | | 1,935.00 | | | | 1,935.00 | 1,935.00 |
| Insurance | | 262.00 | | | | | 262.00 | |
| Outside Svcs | | | 1,700.00 | | | | 1,700.00 | |
| Supplies | 300.00 | 300.00 | 200.00 | | 300.00 | 300.00 | 200.00 | |
| Bank / Merchant Charges | | | 250.00 | | | | 250.00 | |
| Samples Expense | | | 500.00 | | | | 500.00 | |
| Misc. | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 |
| **Total Operating Expense** | 33,669.49 | 4,167.77 | 25,267.08 | 39,973.59 | 4,850.77 | 15,684.20 | 35,780.18 | 33,035.04 |
| Weekly Net Cash Balance | 63,749.36 | 64,061.75 | 29,027.09 | (2,942.90) | 15,663.57 | 3,489.85 | 7,805.05 | 3,770.01 |

Bates 0087

**Total Brand Delivery, Inc.**
**2 Month Cash-Flow Projection**
**For the Period Beginning 01/08/2010 to 03/05/2010**

| | Week-ending 01/15/10 | Week-ending 01/22/10 | Week-ending 01/29/10 | Week-ending 02/05/10 | Week-ending 02/12/10 | Week-ending 02/19/10 | Week-ending 02/26/10 | Week-ending 03/05/10 |
|---|---|---|---|---|---|---|---|---|
| **Opening Cash Position** | | | | | | | | |
| Cash Position | 4,464.95 | 63,749.36 | 64,061.75 | 29,027.09 | (2,942.91) | 15,663.57 | 3,489.85 | 7,805.05 |
| Collections | 92,953.90 | 12,913.34 | 1,336.78 | 17,145.12 | 26,163.64 | 11,562.72 | 49,797.71 | 34,300.00 |
| **Net Cash** | 97,418.85 | 76,662.71 | 65,398.53 | 46,172.21 | 23,220.74 | 27,226.29 | 53,287.57 | 42,105.06 |
| COGS / COD | 0.00 | 8,433.19 | 11,104.36 | 9,141.52 | 2,706.40 | 8,052.23 | 9,702.33 | 5,300.00 |
| Cash net of COGS payments | 97,418.85 | 68,229.52 | 54,294.17 | 37,030.69 | 20,514.34 | 19,174.06 | 43,585.24 | 36,805.06 |
| Payroll | 17,586.10 | | | 17,586.10 | | 1,758.10 | 17,586.10 | 17,586.10 |
| Benefits - Due 11th of each month | 2,234.12 | | | | | 2,234.12 | | |
| Commissions Accrued to be paid | 3,498.50 | | | 3,498.50 | | 2,286.21 | | 4,508.17 |
| Temp Labor | 4,000.00 | | 3,900.00 | | | 4,000.00 | | 3,900.00 |
| IT | | | | | | | 262.00 | |
| Bal Retrig | 1,500.00 | | 1,500.00 | | | 1,500.00 | | 1,500.00 |
| 4Q2009 Sales Tax Due 01/31/10 | | | | 15,283.22 | | | | |
| Bank Line Interest | | | 2,000.00 | | | | 2,000.00 | |
| Rebate Funds | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 |
| Auto | | | 1,889.00 | | | | 1,889.00 | |
| Utilities | | | 6,192.31 | | | | 6,192.31 | |
| Postage / Shipping | 605.77 | 605.77 | 605.77 | 605.77 | 605.77 | 605.77 | 605.77 | 605.77 |
| IT | 945.00 | 262.00 | 945.00 | | 945.00 | | 945.00 | |
| Dues & Subs | | | 900.00 | | | | 900.00 | |
| Insurance | | | 1,935.00 | | | | | 1,935.00 |
| Outside Svcs | | | 1,700.00 | | | | 1,700.00 | |
| Supplies | | | 200.00 | | | | 200.00 | |
| Bank / Merchant Charges | 300.00 | 300.00 | 250.00 | | 300.00 | 300.00 | 250.00 | |
| Samples Expnse | | | 250.00 | | | | 250.00 | |
| Misc. | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 |
| **Total Operating Expense** | 33,669.49 | 4,167.77 | 25,267.08 | 39,973.59 | 4,850.77 | 15,684.20 | 35,780.18 | 33,035.04 |
| **Weekly Net Cash Balance** | 63,749.36 | 64,061.75 | 29,027.09 | (2,942.91) | 15,663.57 | 3,489.85 | 7,805.05 | 3,770.01 |

Bates 0088

# EXHIBIT L

Bates  0089

TO BE OPENED BY
ADDRESSEE ONLY!

**CORPRINT, INC**

PREPARED FOR: **GR4**

OFFICE CODE 0576

AUTOPAY II

(LOCATION: 0001)

| DATE | DAY | TIME |
|------|-----|------|
| 12/29/2009 | TUE | 1000 |

| METHOD | TRIP | SEQ |
|--------|------|-----|
| OT-OTHER | FT1 | |

ATTENTION: ROBERT JACKSON
818-883-8111

SPECIAL INSTRUCTIONS: PAPER ENV
217461057

CORPRINT, INC
360 CORTEZ CIRCLE
CAMARILLO SPRINGS          CA
93012

EMPLOYER SERVICES

TOTAL    CHECKS:     1
TOTAL VOUCHERS:     7

**ADP Payroll Register**

**TOTALSOURCE I**

Company Code: GR4

Batch: 8016-576  Period Ending: 12/31/2009  Week 53
Service Center: 576  Pay Date: 12/31/2009  Page

| PERSONNEL | | HOURS | | | | EARNINGS | | | | | GROSS | STATUTORY DEDUCTIONS | | VOLUNTARY DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Reg | O/T | Hours 3&4 | Earnings 3&4 | Reg | O/T | Earnings 3&4 | Earnings 5 | | | Federal | State/Local | | |
| LEWIS, SCOTT | | | | 8.00 H | | 2,125.00 | | | | | 2,125.00 | 10.01 FIT | 6.47 CA | 1922.59 X CHECKG | Voucher# 53000 |
| File: 000081 | | | | | | | | | | | | 131.75 SS | 23.37 CA | | |
| Dept: 000003 | | | | | | | | | | | | 30.81 MED | SUI/DI | | |
| Clock: XN50X | | | | | | | | | | | | | | | |
| Rate: 2125.00 | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| DEPT TOTAL | | .00 REG | | | | 2,125.00 REG | .00 O/T | | | | 10.01 FIT | | 1,922.59 TOTAL DEDUCTIONS | |
| 000003 | | .00 O/T | | | | .00 EARNINGS 3 | .00 EARNINGS 4 | | | | 131.75 SS | | | |
| | | .00 HOURS 3 | | | | .00 EARNINGS 5 | 2,125.00 GROSS | | | | 30.81 MED | | | |
| | | 8.00 HOURS 4 | | | | | | | | | 6.47 STATE | | | |
| | | | | | | | | | | | 23.37 SUI/DI | | | |

HOURS ANALYSIS:      8.00 H  HOLDAY
STATUTORY DED. ANALYSIS:      6.47 CA  25 CA  SUI/DI
VOLUNTARY DED. ANALYSIS:      23.37 CA  25 CA  SUI/DI
      1,922.59 X  CHECKG

TAXABLE ANALYSIS
FEDERAL TAXABLES:      2,125.00 FIT      .00 FUTA      2,125.00 SS EE      2,125.00 SS ER      2,125.00 MED EE      2,125.00 MED ER
STATE INCOME TAXABLES:      2,125.00 CA
SUI/DI TAXABLES:      2,125.00 CADI

Bates 0091

# ADP Payroll Register

**TOTALSOURCE I**
Company Code: GR4

Batch: 8016-576   Period Ending: 12/31/2009   Week
Service Center: 576   Pay Date: 12/31/2009   Page 2

---

**PERSONNEL: BAUER, MICHAEL**
File: 000053   Dept: 000004   Clock: XN50X   Rate: 2156.25

| HOURS Reg | O/T | Hours 3&4 | Reg | O/T | Earnings 3&4 | Earnings 5 | GROSS | STATUTORY Federal | State/Local | VOLUNTARY DEDUCTIONS | | NET PAY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 8.00 H | | | | 1,398.21 C | | 1,398.21 | 97.10 FIT  80.31 SS  18.78 MED | 25.98 CA  14.25 CA  SUI/DI | 1048.59 X CHECKG  11.00 33 DTL125  10.35 75 AFLAC | 89.00 32 MEDCAL  2.85 34 VIS125 | Voucher  530000 |

**PERSONNEL: HAZLEWOOD, DEBRA**
File: 000059   Dept: 000004   Clock: XN50X   Rate: 2156.25

| HOURS Reg | O/T | Hours 3&4 | Reg | O/T | Earnings 3&4 | Earnings 5 | GROSS | STATUTORY Federal | State/Local | VOLUNTARY DEDUCTIONS | | NET PAY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 8.00 H | | | | 3,006.21 C | | 3,006.21 | 121.14 FIT  183.10 SS  42.82 MED | 147.71 CA  32.49 CA  SUI/DI | 2411.46 X CHECKG  50.04 41 MED | 2.85 34 VIS125  14.60 75 AFLAC | Voucher  530000 |

**DEPT TOTAL 000004**

| HOURS | | | | Earnings | | | GROSS | Federal | State/Local | Deductions | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| .00 REG | .00 O/T | .00 HOURS 3  16.00 HOURS 4 | .00 REG | .00 O/T | .00 EARNINGS 3  EARNINGS 5 | 4,404.42  4,404.42 | O/T  EARNINGS 4  GROSS | FIT  SS  MED  STATE  SUI/DI | | 3,640.74 TOTAL DEDUCTIONS | | 2 Pays |

**HOURS ANALYSIS:**
16.00   H HOLIDAY

**EARNINGS ANALYSIS:**
4,404.42   C COMMSN

**STATUTORY DED. ANALYSIS:**
173.69   25 CA
46.74   25 CA   SUI/DI

**VOLUNTARY DED. ANALYSIS:**
3,460.05   X CHECKG       89.00 32 MEDCAL       5.70 34 VIS125
50.04   41 MED         24.95 75 AFLAC
11.00   33 DTL125

**TAXABLE ANALYSIS**
FEDERAL TAXABLES:   4,248.68 FIT       .00 FUTA       4,248.68 SS EE       4,248.68 SS ER       4,248.68 MED EE       4,248.68 MED ER
STATE INCOME TAXABLES:   4,248.68 CA
SUI/DI TAXABLES:   4,248.68 CADI

Bates 0092

# Payroll Register

**TOTALSOURCE I**

| Company Code: | GR4 |
|---|---|

| Batch: | 8016-576 | Period Ending: | 12/31/2009 | Week: |
|---|---|---|---|---|
| Service Center: | 576 | Pay Date: | 12/31/2009 | Page: |

**PERSONNEL**

| | | HOURS | | | | EARNINGS | | | | | GROSS | STATUTORY DEDUCTIONS | | VOLUNTARY DEDUCTIONS | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Reg | O/T | Hours 3&4 | | Reg | O/T | Earnings 3&4 | Earnings 5 | | | Federal | State/Local | | | |

**ARCHILA, OSCAR**
File: 000074
Dept: 000006   Clock: XN50X   Rate: 12.7500

| Reg 82.00 H | O/T 3.75 | Hours 3&4 8.00 H | Reg 1,045.50 | O/T 71.72 | Earnings 3&4 102.00 H | | GROSS 1,219.22 | FIT 65.83 / SS 71.17 / MED 16.64 | CA 20.23 / CA 12.62 / SUI/DI | CHECKG 900.42 X / VISI25 2.85 34 | MEDICAL 68.50 31 / 401K 60.96 51 |

**SHII, GAVIN**
File: 000061
Dept: 000006   Clock: XN50X   Rate: 16.8300

| Reg 78.75 | | Hours 3&4 6.00 H | Reg 1,325.36 | | Earnings 3&4 100.98 H | | GROSS 1,426.34 | FIT 122.92 / SS 83.32 / MED 19.49 | CA 36.42 / CA 14.78 / SUI/DI | CHILD 185.00 P / DTL125 11.00 33 / 401K 28.53 51 | MEDICAL 68.50 31 / VISI25 2.85 34 / AFLAC 10.35 75 |

**DEPT TOTAL**
000006

| REG 160.75 | O/T 3.75 | HOURS 3 .00 / HOURS 4 14.00 | REG 2,370.86 / O/T / EARNINGS 3 / EARNINGS 4 | O/T 71.72 / EARNINGS 3 202.98 / EARNINGS 5 | | | EARNINGS 4 / GROSS 2,645.56 | FIT 188.75 / SS 154.49 / MED 36.13 / STATE 56.65 / SUI/DI 27.40 | | 1,338.96 TOTAL DEDUCTIONS |

**HOURS ANALYSIS:**
14.00 H HOLDAY
H HOLDAY

**EARNINGS ANALYSIS:**
202.98 H HOLDAY
H HOLDAY

**STATUTORY DED. ANALYSIS:**
56.65 25 CA   SUI/DI
27.40 25 CA   SUI/DI

**VOLUNTARY DED. ANALYSIS:**
185.00 P CHILD
5.70 34 VISI25

| | 900.42 X CHECKG | 51 401K | | 137.00 31 MEDICAL | 11.00 33 AFLAC |
| | 89.49 | | | 10.35 75 | |

**TAXABLE ANALYSIS**

| FEDERAL TAXABLES: | 2,402.37 FIT | | | | 2,491.86 SS EE | 2,491.86 SS ER | 2,491.86 MED EE | 2,491.86 MED ER |
| STATE INCOME TAXABLES: | 2,402.37 CA | | .00 FUTA | | | | | |
| SUI/DI TAXABLES: | 2,491.86 CADI | | | | | | | |

Bates 0093

| PERSONNEL | HOURS Reg | O/T | Hours 3&4 | EARNINGS Reg | O/T | Earnings 3&4 | Earnings 5 | GROSS | STATUTORY DEDUCTIONS Federal | State/Local | VOLUNTARY DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EWIS, KIMBERLY JANE | | | 8.00 H | 1,000.00 | | | | 1,000.00 | 34 38 FIT<br>62 00 SS<br>14 50 MED | 14 37 CA<br>11 00 CA<br>SUI/DI | 656 99 X CHECKG | 206 76 I 401K | Voucher #<br>530008 |
| File: 000079<br>Dept: 000007<br>Clock: XN50X<br>Rate: 1350 00 | | | | | | | | | | | | |
| EWIS, MARC | | | | 5,000.00 | | | | 5,000.00 | 476 07 FIT<br>72 50 MED | 245 48 CA | 3889.19 6 PREPAY<br>36.50 78 DENTAL | 270 50 77 MED<br>9.76 79 VISION | Adjustment<br>Void |
| File: 000065<br>Dept: 000007<br>Clock: XN50X<br>Rate: 7000 00 | | | | | | | | | | | | |
| | | | 8.00 H | 4,000.00 | | | | 4,000.00 | 278 14 FIT<br>58 00 MED | 143 71 CA | 3203.39 X CHECKG<br>36.50 78 DENTAL | 270 50 77 MED<br>9.76 79 VISION | Voucher #<br>530005<br>Pay |
| Dept: 000007<br>Rate: 7000 00 | | | | | | | | | | | | |
| LOVER, KRISTINA | 84.00 | .75 | 6.00 H | 2,436.00 | 32.63 | 174.00 H | | 2,642.63 | 46 84 FIT<br>152 39 SS<br>35 84 MED | 95 68 CA<br>27 00 CA<br>SUI/DI | 2100.44 X CHECKG<br>6.11 34 VIS125 | 178.50 32 MEDCAL | Voucher #<br>530007<br>Pay |
| File: 000070<br>Dept: 000007<br>Clock: XN50X<br>Rate: 29.0000 | | | | | | | | | | | | |
| DEPT TOTAL 000007 | 84.00<br>.75<br>.00<br>22.00 | REG<br>O/T<br>HOURS 3<br>HOURS 4 | | 12,436.00<br>.00<br>.00 | REG<br>EARNINGS 3<br>EARNINGS 5 | 32.63<br>174.00<br>12,642.63 | O/T<br>EARNINGS 4<br>GROSS | | 835 43 FIT<br>214.39 SS<br>180 64 MED<br>499 24 STATE<br>38.03 SUI/DI | | 10,874 90 TOTAL DEDUCTIONS | |

OURS ANALYSIS:        22.00  H  HOLDAY
ARNINGS ANALYSIS:    174.00  H  HOLDAY
TATUTORY DED. ANALYSIS:    499.24  25 CA
                           38.03  25 CA  SUI/DI
OLUNTARY DED. ANALYSIS:   206.76  I  401K
                            6.11  34 VIS125
AXABLE ANALYSIS
EDERAL TAXABLES:    12,458.02  FIT
TATE INCOME TAXABLES:    12,458.02  CA
UI/DI TAXABLES:    3,458.02  CADI

5,960.82    X CHECKG    5,000.00
541 00  77 MED

3,889.19  6 PREPAY
73.00  78 DENTAL

3,458.02  SS ER

12,458.02  SS EE

.00  FUTA

3,458.02  SS EE

12,458.02  MED EE    12,458.02  MED ER

**ADP Payroll Register**

**TOTALSOURCE I**
Company Code: GR4

Batch: 8016-576      Period Ending 12/31/2009    Week 3
Service Center 576      Pay Date 12/31/2009    Page

| COMPANY TOTAL COMPANY CODE | HOURS | EARNINGS | | | STATUTORY DEDUCTIONS | VOLUNTARY DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|---|---|
| GR4 | | | | | | | 8 Pays 843. |

**EARNINGS**

| | | | | |
|---|---|---|---|---|
| 244.75 REG | 16,931.86 REG | | 104.35 O/T | 1,252.43 FIT |
| 4.50 O/T | .00 EARNINGS 3 | | 4,781.40 EARNINGS 4 | 764.04 SS |
| .00 HOURS 3 | .00 EARNINGS 5 | | 21,817.61 GROSS | 309.18 MED |
| 60.00 HOURS 4 | | | | 738.05 STATE |
| | | | | 135.54 SUI/DI |

| | 60.00 H HOLDAY | | H HOLDAY | 17,777.19 TOTAL DEDUCTIONS |

HOURS ANALYSIS:

EARNINGS ANALYSIS:
4,404.42 C COMMSN 376.98 H HOLDAY

STATUTORY DED. ANALYSIS:
736.05 25 CA
135.54 25 CA SUI/DI

VOLUNTARY DED. ANALYSIS:

| | | | | | | |
|---|---|---|---|---|---|---|
| 206.76 I 401K | 185.00 P CHILD | 12,243.88 X CHECKG | 3,889.19 6 PREPAY |
| 137.00 31 MEDICAL | 267.50 32 MEDICAL | 22.00 33 DTL125 | 17.51 34 VIS125 |
| 50.04 41 MED | 89.49 51 401K | 35.30 75 AFLAC | 541.00 77 MED |
| 73.00 78 DENTAL | 19.52 79 VISION | | |

NET PAYROLL: 843.18 CHECKS: 1 FLAGGED: 1 STARTING CHECK NUMBER 50320032
TOTAL DEPOSITS: 12,243.88 VOUCHERS: 7 NET CASH PAYS 1,000.00 OR MORE 2 ENDING CHECK NUMBER 50320032
NET VOIDS: .00 ADJUSTMENTS 1 5
NET CASH: 13,087.06

TAXABLE ANALYSIS
FEDERAL TAXABLES: 21,234.07 FIT .00 FUTA 12,323.56 SS EE 12,323.56 SS ER 21,323.56 MED ER 21,323.56 MED EE
STATE INCOME TAXABLES: 21,234.07 CA
SUI/DI TAXABLES: 12,323.56 CADI

ADP® Payroll Register Company Totals

TOTALSOURCE I
Company Code, GR4

Batch: 8016-576   Period Ending 12/31/2009   Week 1
Service Center: 576   Pay Date 12/31/2009   Page

Bates 0095

## LIST OF SUB-CONTRACTOR PAYMENTS
## DUE JANUARY 15, 2010 FOR THE PERIOD
## JANUARY 4 THOUGH JANUARY 8, 2010

· Robert Jackson – Accounting contractor 31 hours @ 620.00

· Michael Mossman- Project coordinator 29 hours @ 348.00

· Jill Glass-Project coordinator promotions 38 hours @ 570.00

· Dean "DJ" Josefsberg – IT consultant $500.00

· Jonathon Noga- Warehouse labor-$130.00

· Charleen Morla- Freelance graphic design $ 67.50

· Tim Peterman- Warehouse labor $115.00

### Total Due: $2,350.50

Bates 0096

# EXHIBIT M

Bates 0097

1 | LAW OFFICES OF STEVEN R. FOX
Steven R. Fox, State Bar No. 138808
2 | 17835 Ventura Boulevard, Suite 306
Encino, California 91316
3 | (818) 774-3545

4 | Attorney for Debtor-in-Possession

5

6

7

8

9                          UNITED STATES BANKRUPTCY COURT

10                          CENTRAL DISTRICT OF CALIFORNIA

11                                  NORTHERN  DIVISION

12 | In re                                    ) CASE NO. _____
                                             )
13 | Corprint, Inc.,                          ) CHAPTER 11
                                             )
14 |           Debtor.                        ) **NOTICE OF ORDER GRANTING
                                             ) DEBTOR'S APPLICATION FOR AN**
15                                            ) **ORDER FIXING DEADLINES FOR
                                             ) FILING PROOFS OF CLAIM AND**
16                                            ) **APPROVING FORMS OF NOTICE**
                                             )
17                                            ) Date:
                                             ) Time:       *NO HEARING DATE SET*
18                                            ) Place:
                                             )
19 | _____ ) **BAR DATE**

20

21 |        TO ALL PERSONS AND ENTITIES WHO HOLD OR MAY HOLD A CLAIM
AGAINST THE BANKRUPTCY ESTATE OF CORPRINT, INC.:

22 |        The United States Bankruptcy Court for the Northern District of California has
set _____ (prevailing Pacific time) (the "Bar Date") as the
23 | last date for each person or entity (including individuals, current and former
employees, partnerships, corporations, joint ventures, trusts and governmental units)
24 | to file a proof of claim against the Debtor.  A bar date means a last day for creditors
and others who assert any form of claim that arose prepetition, that is, before the
25 | chapter 11 petition was filed against the Debtor, to assert their claim(s) by filing a
"Proof of Claim" with the Bankruptcy Court and serving the proof of claim on the
26 | Debtor's counsel.  Filing a proof of claim is an important right that you may possess
in this bankruptcy case.  Your failure to timely file a proof of claim means that you will
27 | be barred from forever asserting your prepetition claim against the Debtor.

28 | ///

The Bar Date and the procedures set forth below for filing proofs of claim apply to all claims against the Debtor that arose prior to January 11, 2010, the date the Debtor commenced its case under Chapter 11 of the United States Bankruptcy Code (the "Filing Date") except those holders of the claims listed below that are specifically excluded from the Bar Date filing requirement.

You have been sent this notice because you may be a creditor. You may be an employee of the Debtor or a former employee of the Debtor and may hold a prepetition claim against the bankruptcy estate. You may not hold any claim. If you hold a claim against the Debtor, the claim is not scheduled, and you do not timely file a proof of claim following the procedures specified in this notice, then such claims will be forever barred as against the Debtor.

1.    APPLICABLE DEADLINES

**Except as otherwise set forth below, the bar date shall be _____ (the "General Bar Date").** A failure by a creditor or other party in interest to timely file such a proof of claim will result in the disallowance of that claim.

The 30th day following the General Bar Date should be fixed as the last date on which a proof of claim may be timely filed by any entity —such as a guarantor, surety, endorser, or other co-debtor—that is authorized to file a claim under Bankruptcy Code section 501(b) and Bankruptcy Rule 3005 (the " Co-Debtor Bar Date "). Because the authority of such co-debtors to file proofs of claim on behalf of other creditors is contingent, in part, upon whether the primary creditor timely filed a proof of claim, the Court should require any such claims to be filed within 30 days after the General Bar Date, as provided under Bankruptcy Rule 3005. The Debtor believes that this 30-day filing period is reasonable and appropriate and provides co-debtors with sufficient time to file proofs of claim in these cases.

_____, should be fixed as last date on which a governmental unit may timely file a proof of claim in these cases asserting a claim against the Debtors or their estates (the "Governmental Bar Date"). Bankruptcy Code section 502(b)(9) provides that a claim of a governmental unit is timely filed only if it is filed on or before 180 days after the date of the order for relief, or such later time as the Bankruptcy Rules may provide. This case was commenced more than 180 days prior to _____. As such, the Governmental Bar Date comports with the requirements of section 502(b)(9), and additional time need not be provided.

For claims arising from the avoidance of a transfer under chapter 5 of the Bankruptcy Code, the date by which the entity asserting the claim may timely file a proof of that claim should be fixed as the later of the following two dates (the "Avoidance Claims Bar Date"): (a) the General Bar Date; or (b) the first business day that is 30 calendar days after entry of the order authorizing avoidance of the transfer.

For claims arising under Bankruptcy Code section 502(i) with respect to the assessment of certain taxes, the date by which the entity asserting the claim may timely file a proof of claim should be fixed as the later of the following two dates (the "502(i) Bar Date"): (a) the General Bar Date; or (b) the first business day that is 30 calendar days after such tax claim arises under Bankruptcy Code §502(i).

For claims under Bankruptcy Code section 502(g) arising from the rejection of an executory contract or unexpired lease, the date by which the entity asserting the claim may timely file a proof of that claim should be fixed as the later of the following two dates (the "Rejection Bar Date"): (a) the General Bar Date; or (b) the first business day that is 30 calendar days after the entry of the order approving the rejection of the executory contract or lease.

## 2.   WHO MUST FILE A PROOF OF CLAIM

You MUST timely file a proof of claim to vote on a Chapter 11 plan to be filed by the Debtor or to share in distributions from the Debtor's bankruptcy estates if you have a claim that arose prior to the Filing Date", and it is not one of the types of claims described below. Claims based on acts or omissions of the Debtor that occurred before the Filing Date, must be filed on or prior to the Bar Date, even if such claims are not now fixed in amount, liquidated or certain or did not mature or become fixed, liquidated or certain before the Filing Date. Under §101 of the Bankruptcy Code and as used here, "claim" means: (a) a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

## 3.   WHAT TO FILE

Your filed proof of claim must conform substantially to Official Form No. 10. A copy of the official form is attached to this Notice. You may obtain a copy of the proof of claim form from the Bankruptcy Court in person or via the Internet at the Bankruptcy Court's website (http://www.cacb.uscourts.gov/, select "court forms" and then select "court forms"). You may obtain a form from your attorney.

All proof of claim forms must be signed by the claimant or, if the claimant is not an individual, by an authorized agent of the claimant. It must be written in English and be denominated in United States dollars. You must attach to your completed proof of claim any documents on which the claim is based (if voluminous, attach a summary) or an explanation as to why the documents are not available.  Do not attach any original documents as the Court may destroy the documents after scanning them in. You must also attach a power of attorney in the event the signatory is someone other than the holder of the claim.

## 4.   WHEN AND WHERE TO FILE

Except as provided for below, all original proofs of claim must be filed so as to be received on or before June 8, 2009, at 2:00 p.m. (prevailing Pacific time), at this address whether by mail, messenger or overnight courier:

United States Bankruptcy Court
for the Central District of California
Northern Division
1415 State Street
Santa Barbara, California 93101-2511

Bates 0100

1    Proofs of claim will be deemed timely filed only if actually received by the
Bankruptcy Court on or before the Bar Date. You may not file a proofs of claim with
2    the Court by telecopy or electronic mail transmission.

3    A copy of the complete proof of claim must be sent to the following address:

4    Law Offices of Steven R. Fox
17835 Ventura Blvd.  Suite 306
5    Encino, CA 91316

6    5.    WHO NEED NOT FILE A PROOF OF CLAIM

7    You do not need to file a proof of claim on or prior to the Bar Date if you are:

8    (a) any person or entity that has already filed a proof of claim against the
Debtor with the Bankruptcy Court in a form substantially similar to Official
9    Bankruptcy Form No. 10;

10   (b) any person or entity whose claim is listed on the Schedules filed by the
Debtor; provided, however, that: (I) the claim is not scheduled as
11   "disputed,""contingent" or "unliquidated"; (ii) the claimant does not disagree
with the amount, nature and priority of the claim as set forth in the Schedules;
12   and (iii) the claimant does not dispute that the claim is an obligation of the
Debtor against which the claim is listed in the Schedules;

13
(c) any holder of a claim that heretofore has been allowed by order of this
14   Court;

15   (d) any person or entity whose claim has been paid in full by the Debtor;

16   (e) any holder of a claim for which specific deadlines have previously been
fixed by this Court;
17
(f) any holder of a claim allowable under § 503(b) and § 507(a) of the
18   Bankruptcy Code as an expense of administration.

19   If you are a holder of an equity interest in the Debtor, you need not file a proof
of interest with respect to the ownership of such equity interest at this time.  If you
20   assert a claim against the Debtor, including a claim relating to such equity interest or
the purchase or sale of such interest, a proof of such claim must be filed on or prior
21   to the Bar Date pursuant to procedures set forth in this Notice.

22   This Notice is being sent to many persons and entities that have had some
relationship with or have done business with the Debtors but may not have a claim
23   against the Debtor. The fact that you have received this Notice does not mean that
you have a claim or that the Debtor or the Court believe that you have a claim
24   against the Debtor.  For example, you may be an employee or a former employee
of the Debtor.  The Debtor believes that no employees, either current or former, hold
25   any claims against it.  However, a particular employee may disagree and may believe
that he/she holds a claim.  The Bar Date applies to any prepetition claim that you
26   may hold against the Debtor.  You must file your proof of claim with the Court by the
Bar Date or else your prepetition claim will be forever barred in this Court or any
27   other court.

28

## 6.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES

You may have a claim arising out of the rejection of an executory contract or unexpired lease. For claims arising from rejection of executory contracts or unexpired leases pursuant to 11 U.S.C. 365, the last day to file a proof of claims is (a) 30 days after the date of entry of the order authorizing the rejection, or (b) the Bar Date, whichever is later.

## 7.    CONSEQUENCES OF FAILURE TO FILE A PROOF OF CLAIM BY THE BAR DATE.

Any holder of a claim that is not excepted from the requirements of the Court's order, as set forth above and that fails to timely file a proof of claim in the appropriate form will be barred from asserting such claim against the Debtor and the chapter 11 estate, from voting on any plan of reorganization filed in these cases, and from participating in any distribution in the Debtor's cases on account of such claim.

## 8.    THE DEBTOR'S SCHEDULES AND ACCESS THERETO

You may be listed as the holder of a claim against the Debtor in the Debtor's Schedules and/or Schedules of Executory Contracts and Unexpired Leases (collectively, the "Schedules").    If you agree with the nature, amount and status of your claim as listed in the Debtor's Schedules, and if your claim is not described as "disputed," "contingent," or "unliquidated," you need not file a proof of claim. Otherwise, if you decide to file a proof of claim, you must do so before the Bar Date in accordance with the procedures set forth in this Notice.

Copies of the Debtor's Schedules are available for inspection via the Court's PACER Internet system for which a login and password are required.  You may obtain a login and password to the Court's PACER system through the PACER Service Center at http://www.pacer.psc.uscourts.gov. Copies of the Schedules may also be examined between the hours of 9:00 a.m. and 4:00 p.m., Monday through Friday, at the Office of the Clerk of the Bankruptcy Court.

You may make a written request for a copy of the Debtor's Schedules from Debtor's counsel to emails@foxlaw.com.  The Schedules will be provided only by email.  Please expect a response time of approximately one business day or longer from Debtor's counsel. By making a request for a copy of the Schedules from Debtor's counsel, you acknowledge that Debtor's counsel may not timely respond (or respond at all) to your written request and that the electronic system used to reply to your written request may fail (e.g., your ability to receive the particular size file).  You explicitly agree that in the event you make a request for a copy of the Debtor's Schedules and Debtor's counsel does not respond to your written request or does so untimely, you are barred from asserting either of these failures as grounds to seek an extension of time to file your proof of claim and you are barred from asserting that your proof of claim should be deemed timely filed.  If your request for a copy of the Schedules is made to Debtor's counsel in the 3 days prior to the bar date, Debtor's counsel will not respond. Debtor's counsel will not answer questions concerning your claim and its amount.  You need to discuss these issues with your attorney.

You can ask your attorney to obtain a copy of the schedules for you.

A holder of a possible claim against the Debtor should consult an attorney regarding any matters not covered by this notice, such as whether the holder should file a proof of claim.

Dated:                   1          LAW OFFICES OF STEVEN R. FOX

                                    By: _____
                                    Steven R. Fox, counsel for Debtor-in-
                                    Possession

# EXHIBIT N

Bates 0104

LAW OFFICES OF STEVEN R. FOX
Steven R. Fox, CBN 138808
17835 Ventura Boulevard, Suite 306
Encino, California  91316
(818) 774-3545   Fax (818) 774-3707

Attorneys for Debtor-in-Possession

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA - NORTHERN DIVISION

| | |
|---|---|
| In re | CASE NO. |
| | CHAPTER 11 |
| Corprint, Inc. | NOTICE TO CREDITORS REGARDING RECEIVING SERVICE OF MOTIONS, APPLICATIONS, NOTICES AND OTHER MATTERS VIA ELECTRONIC TRANSMISSION |
| Debtor. | Date    No hearing required<br>Time<br>Place |

**TO ALL CREDITORS AND PARTIES IN INTEREST:**

**PLEASE TAKE NOTICE** that Corprint, Inc., ("Debtor") has filed a petition for relief under Chapter 11 of the U.S. Bankruptcy Code.

Under the Federal Rules of Bankruptcy Procedure, creditors and parties in interest are entitled to notice of certain motions and applications that may be filed in the bankruptcy case. In this case, you will likely receive an extensive amount of pleadings in the next few months. Parties active in bankruptcy cases can, with their written consent, receive these pleadings and papers by email instead. The benefits of electronic service include faster service, less paper as well as less administrative time devoted to managing paper flow. If you would like to receive by email all motions, pleadings, notice, and other matters that you are entitled to receive please fill out the short form on the next page, sign your name, date the form and make sure you indicate your capacity or position.

Please send the form to emails@foxlaw.com or by fax to (818) 774-3707.

Dated:                                        Respectfully submitted,

                                                  LAW OFFICES OF STEVEN R. FOX

                                                  _____/s/_____
                                                  Steven R. Fox, proposed counsel for
                                                  Corprint, Inc., Debtor-in-Possession

# CONSENT TO RECEIVE SERVICE BY ELECTRONIC

## TRANSMISSION (EMAIL) IN THE CORPRINT, INC.

## CHAPTER 11 CASE

On behalf of the creditor or party in interest identified below, I have the authority to request that service by made by electronic transmission (email) service of motions, applications, notices and other matters to which the creditor or party in interest may be entitled to receive by U.S. mail and I make this request.

I understand that the creditor or party in interest will not receive service of all papers by email but those pleadings and notices which it is entitled to receive.

Name of creditor or party in interest: _____

Mailing address of creditor or party in interest:

_____

_____

_____

Email address of creditor or party in interest:

_____

_____

Dated: _____, 2009

Your signature: _____

Print your name: _____

Your position or title: _____

# EXHIBIT O

Bates 0107

# Monthly Utility Averages

| | |
|---|---|
| Verizon Wireless (10 mo) | $1,820.87 |
| A T & T (11 mo) | $   34.06 |
| E J Harrison & Sons (12 mo) | $  161.53 |
| So CA Edison  (13 mo) | $  832.81 |
| PG Telecom (13 mo) | $1,673,09 |
| Gas Company (12 mo) | $   37.99 |
| Camrosa Water (12 mo) | $  300.88 |

## Total          $4,861.23

Verizon Wireless
P O Box 9622
Mission Hills CA 91346

Billed To:       Total Brand Delivery

| Date of Invoice | Amount | Total Due | Amount Paid | Due |
|---|---|---|---|---|
| 1/9/2009 | 1851.29 | 1851.29 | 1851.29 | 0 |
| 2/26/2009 | 1878.87 | 1878.87 | 1878.87 | 0 |
| 3/29/2009 | 1843.39 | 1843.39 | 1843.39 | 0 |
| 4/28/2009 | 2176.78 | 2176.78 | 2176.78 | 0 |
| 5/29/2009 | 2033.82 | 2033.82 | 2033.82 | 0 |
| 6/28/2009 | 2072.24 | 2072.24 | 2072.24 | 0 |
| 7/29/2009 | 1752.46 | 1752.46 | 1752.46 | 0 |
| 8/29/2009 | 1523.8 | 1523.8 | 1523.8 | 0 |
| 9/28/2009 | 1575.71 | 1575.71 | 1575.71 | 0 |
| 10/29/2009 | 1500.35 | 1500.35 | 1500.35 | 0 |

18208.71   **1820.871 Average**

AT & T
Auto Phone 818-887-8877

Billed To:        Corprint Inc.

| Date of Invoice | Date Paid | Amount | Due |
|---|---|---|---|
| 12/18/2008 | 1/13/2009 | 34.04 | $0.00 |
| 1/19/2008 | 2/11/2009 | 34.05 | $0.00 |
| 2/19/2009 | 3/13/2009 | 34.00 | $0.00 |
| 3/19/2009 | 4/10/2009 | 34.01 | $0.00 |
| 4/18/2009 | 5/12/2009 | 33.94 | $0.00 |
| 5/18/2009 | 6/11/2009 | 34.01 | $0.00 |
| 6/19/2009 | 7/10/2009 | 34.11 | $0.00 |
| 7/18/2009 | 8/12/2009 | 34.11 | $0.00 |
| 8/19/2009 | 9/10/2009 | 34.14 | $0.00 |
| 9/18/2009 | 10/13/2009 | 34.14 | $0.00 |
| 10/19/2009 | 11/12/2009 | 34.08 | $0.00 |
| | **Total** | **374.63** | |
| | **Average Mo.** | | **$34.06** |

E J Harrison & Sons
P O box 4009
Ventura CA 93007-4009

Billed To:    Total Brand Delivery

| Date of Invoice | Amount | Total Due | Amount Paid | Due |
|---|---|---|---|---|
| 10/13/2008 | $160.51 | | | $160.51 |
| 11/13/2008 | $160.51 | $321.02 | | $321.02 |
| 12/11/2008 | $160.51 | $481.53 | $160.51 | $321.02 |
| 1/14/2009 | $160.51 | $481.53 | $160.51 | $321.02 |
| 2/15/2009 | $160.51 | $481.53 | $481.53 | $0.00 |
| 3/12/2009 | $160.51 | | | $160.51 |
| 4/14/2009 | $160.51 | $321.02 | | $321.02 |
| 5/14/2009 | $160.51 | $481.53 | $160.51 | $321.02 |
| 6/14/2009 | $160.51 | $481.53 | $321.02 | $160.51 |
| 7/14/2009 | $164.60 | | | $325.11 |
| 8/13/2009 | $164.60 | $489.71 | $160.51 | $329.20 |
| | | | $164.60 | $164.60 |
| 9/14/2009 | $164.60 | $329.20 | | $329.20 |
| **TOTAL** | **$1,938.39** | | | |
| | Average = | **$161.53** | | |

Southern CA Edison
P O Box 300
Rosemead CA 91772-0001

Billed To:       SCE Gaskets Inc       Account No. 264281320

| Date of Invoice | New Billing | Paid |
|---|---|---|
| 10/1/2008 | $1,074.53 | $1,074.53 |
| 11/1/2008 | $722.57 | $722.57 |
| 12/1/2008 | $685.97 | $685.97 |
| 1/1/2009 | $625.66 | $625.66 |
| 2/1/2009 | $646.75 | $646.75 |
| 3/1/2009 | $638.09 | $638.09 |
| 4/1/2009 | $593.22 | $593.22 |
| 5/1/2009 | $715.91 | $715.91 |
| 6/1/2009 | $760.23 | $760.23 |
| 7/1/2009 | $1,028.47 | $1,028.47 |
| 8/1/2009 | $1,136.57 | $1,136.57 |
| 9/1/2009 | $1,203.79 | $1,203.79 |
| 10/1/2009 | $994.72 | $994.72 |
| | $10,826.48 | |

$832.81 Average per Mo

Bates 0112

Pg Telecom Holding Inc.
Dept 595
PO Box 17553 Baltimore MD 21203-7553

Billed To:        Corprint Inc.

| Date of Invoice | Date Paid | Amount | Due |
|---|---|---|---|
| 11/1/2008 | Auto Debit | $1,522.93 | $1,522.93 |
| 12/1/2008 | Auto Debit | $1,528.22 | $1,528.22 |
| 1/1/2009 | Auto Debit | $1,433.08 | $1,433.08 |
| 2/1/2009 | Auto Debit | $1,394.34 | $1,394.34 |
| 3/1/2009 | Auto Debit | $1,419.44 | $1,419.44 |
| 4/1/2009 | Auto Debit | $1,469.06 | $1,469.06 |
| 5/1/2009 | Auto Debit | $1,398.24 | $1,398.24 |
| 6/1/2009 | Auto Debit | $1,385.09 | $1,385.09 |
| 7/1/2009 | Auto Debit | $1,382.80 | $1,382.80 |
| 8/1/2009 | Auto Debit | $1,388.48 | $1,388.48 |
| 9/1/2009 | Auto Debit | $1,365.81 | $1,365.81 |
| 10/1/2009 | Auto Debit | $1,366.01 | $1,366.01 |
| 11/1/2009 | Auto Debit | $1,350.47 | $1,350.47 |
| | **Total** | **$18,403.97** | |
| | **Average Mo.** | | **$1,673.09** |

The Gas Company
P O Box C
Mont Pk CA 91756

Billed To:        Corprint Inc.

| Date of Invoice | Amount | Total Due | Amount Paid | Due |
|---|---|---|---|---|
| 12/2/2008 | $33.16 | $33.16 | $33.16 | $0.00 |
| 1/2/2009 | $73.20 | $73.20 | $73.20 | $0.00 |
| 2/13/2009 | $48.36 | $48.36 | $48.36 | $0.00 |
| 3/15/2009 | $70.76 | $70.76 | $70.76 | $0.00 |
| 4/13/2009 | $68.27 | $68.27 | $68.27 | $0.00 |
| 5/14/2009 | $35.04 | $35.04 | $35.04 | $0.00 |
| 6/13/2009 | $26.50 | $26.50 | $26.50 | $0.00 |
| 7/12/2009 | $25.88 | $25.88 | $25.88 | $0.00 |
| 8/10/2009 | $24.32 | $24.32 | $24.32 | $0.00 |
| 9/10/2009 | $24.89 | $24.89 | $24.89 | $0.00 |
| 10/10/2009 | $25.47 | $25.47 | $25.47 | $0.00 |
| 11/8/2009 | $26.79 | $26.79 | $26.79 | $0.00 |
| | **TOTAL** | | **$455.85** | |
| | **Average** | | **$37.99** | |

Camrosa Water District
7385 Santa Rosa Road
Camarillo CA 93012-0226

Billed To:          Total Brand Delivery

| Date of Invoice | Amount | Total Due | Amount Paid | Due |
|---|---|---|---|---|
| 10/25/2008 | $139.59 | | | |
| 11/25/2008 | $215.26 | $354.85 | | $354.85 |
| 12/25/2008 | $158.91 | $513.76 | $139.59 | $374.17 |
| 1/25/2009 | $134.71 | $508.88 | $215.26 | $293.62 |
| | | | $158.91 | $134.71 |
| 2/25/2009 | $100.49 | $100.49 | $134.71 | $100.49 |
| 3/25/2009 | $104.31 | $204.80 | | $204.80 |
| 4/25/2009 | $120.87 | $325.67 | $100.49 | $225.18 |
| | | | $204.80 | $20.38 |
| 5/23/2009 | $135.36 | $155.74 | | $155.74 |
| 6/25/2009 | $131.22 | $286.96 | $20.38 | $266.58 |
| | | | $135.36 | $131.22 |
| 7/25/2009 | $144.89 | $276.11 | $131.22 | $144.89 |
| 8/25/2009 | $136.61 | $281.50 | $144.89 | $136.61 |
| 9/25/2009 | | | | |
| | | $3,008.76 | $300.88 Average | |